# STAPLETON *v.* KINNEY.

PATENTS; INTERFERENCE; REASONABLE DILIGENCE.

Where S., a patent attorney and skilled mechanic, conceived an invention of an improved retaining device for rubber tires in April, 1897, and could have applied it to practical use at any time by means then well known in the art, with which he was thoroughly acquainted, although such means were crude and imperfect, but instead of doing so he devoted his time for more than two years to devising a simple and economical machine for applying the retaining device, so that he did not reduce to practice until November, 1899, and in the meantime K. conceived in October, 1898, and reduced to practice in April, 1899, it was *held,* that S. did not exercise due diligence in regard to the retaining device and K. was entitled to award of priority.

No. 170. Patent Appeals. Submitted May 14, 1901. Decided June 7, 1901.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Charles W. Stapleton* in proper person.

*Messrs. Peirce & Fisher* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner of Patents in an interference proceeding involving priority of invention of an improved rubber tire for the wheels of vehicles. This issue is in the following words:

" A tire for vehicles comprising an annular channel, an annular elastic body compressed in the direction of its length and molded with a continuous closed chamber throughout its length, and a retaining-ring embedded within and filling said

chamber and having its ends joined together, said ring consisting of a central web having solid thickened edges, said thickened edges extending both above and below the plane, of said web and thus forming channels on both sides of the ring to receive the compressed rubber of the body, and hold the ring against lateral displacement."

Frank W. Kinney filed his application for patent January 16, 1899, and was followed by Charles W. Stapleton on the 23d day of the following June.

We agree with the tribunals of the Patent Office that the following facts are fairly established by the evidence:

Stapleton conceived the invention of the issue and disclosed it to others about April 1, 1897, and reduced it to actual practice about November 1, 1899. Kinney conceived and disclosed it about October 15, 1898, made and put in use upon a vehicle, a full set of tires embodying the improvement about April 1, 1899.

Stapleton, though first to conceive, did not enter the Office, even, until more than two months after Kinney had begun the manufacture and sale of the improved tires; hence the burden of showing due diligence was cast upon him. In determining this issue it is of importance to know what was the state of the art in which the invention is an improvement, and some of its conditions will be briefly stated.

Rubber tires had been in use upon vehicles for some years, and many different forms of construction had been experimented with. Two only of the special devices used for retaining the rubber tire in the flange on the wheel-rim need be described, because they were greatly superior to all others and, besides, have near relation to the improvement of the issue. One of these consisted of two round steel wires inserted in the tires parallel with each other and a short distance apart; the sizes of wire and separating distances varying with the width of the tire. The other was a flat steel band with straight edges likewise inserted in an aperture in the tire.

The rubber sections were cut in the desired lengths and the retaining wires or bands inserted. The ends of the lat-

ter were then fastened by riveting, brazing, or electric welding, and the inclosing rubber ends were brought together and cemented. It was soon discovered that the retaining wires of the first construction had a tendency, especially under hard usage, to cut down through the inclosing rubber tire, thereby gradually destroying it, as well as reducing the constriction. They seem, however, to have worked better than the flat band that had been devised to remedy their defects in this respect, because the lateral cutting of its straight edges was more rapidly destructive of the tire.

The improvement of the issue is a practical combination of the two earlier devices. The two round wires are joined together by a flat band varying in width with that of the tire. It is claimed for the improved retaining device, that joining the wires in this manner prevents the downward wear, whilst their operation in rounding the edges of the band prevents the dangerous lateral cutting. The first method of applying the rubber tire was to fasten the ends as above described. It was then stretched and pushed over the edge of the flange until it dropped into its proper place therein. This construction and application were attended with two difficulties that operated against the commercial use of the tire. First, there was the danger of severing the connections of the retaining wires or band under the strain of the necessary stretching; second, the tire was often too loose when forced to its place in the flange.

Efforts were early made by manufacturers to devise a better means for applying the tires to wheels. Stapleton, who is a skilled patent attorney, had been a practical mechanic in early life. He testified that throughout 1897, and until October 15, 1898, he had been " president and manager of the American Rubber Tire Co., and actively engaged in looking after its business, also practicing law. During this time I looked after not only the business features of the company, but the mechanical as well; in fact, did substantially all of the mechanical part of the work so far as designing and devising tools, machinery and tires are concerned."

Again he said: " I was never satisfied with the method

of first making the tire into a hoop and stretching it over the flange, and since about January, 1897, I began to evolve a plan to apply them by drawing them up within the steel flange. That had never been done, so far as I know, until the fall of 1897, when the Rubber Tire Wheel Co., Morgan and Wright, and myself, all working to reach that end, accomplished it about the same time by different tools or the use of different tools. This system, however, was not perfected so that it could be said to be thoroughly practicable, until late in 1898."

It appears from testimony on behalf of Kinney that the Morgan and Wright method of bringing the retaining wires and rubber tires together in the channels of the wheel-rims, was practiced in the shops of the Calumet Rubber Tire Co. in January, 1897. The ends of the wires were clamped and the rubber was compressed and forced back a short distance to a point on each side where it was firmly held by a vise. The tire was then brought around the wheel in the channel and the wires were drawn until the desired tension was had. The ends were fastened by threaded sleeves. The clamps were then removed and the rubber was driven back to meet over the joint, by striking against the wall or with a heavy mallet. In February, 1897, an improvement was made in the clamping system and the wires were joined by brazing instead of screwing together as before. Many tires were thus applied and sold to customers. Kinney subsequently worked upon and had made a device for clamping the tires and reducing the compression of the rubber after fastening the retaining wires.

It may be assumed that the retaining band of the issue was harder to stretch over the flange of the rim in the old way than the other devices had been, and that it was of very great importance to devise an effective way to fasten it in the channel. Kinney discovered the improvement and filed his application for a patent before securing a satisfactory device for the purpose. He subsequently manufactured tires with the improved bands, and applied them to the wheels as he had applied the others in January and February, 1897.

It was shown that some other factories used the Morgan and Wright process, or others of their own adaptation, in applying rubber tires in 1897, 1898, and early in 1899.

We come now to consider the special grounds offered by Stapleton in excuse of his apparent delay in reducing to practice his conception of the improvement in, or before, April, 1897.

It must be remembered that he was fully informed of the state of the art, and alive to the defects of all the retaining devices then in use. He appreciated the increasing demand for rubber tires of ready application and was pecuniarily interested in supplying it. Not only an educated and skilled mechanic, he was also a competent and experienced patent attorney; and hence was aware of the importance of diligence in reducing conception to practice either actual or constructive. He had ample time, money and agencies for experimentation and there was no reasonable obstacle in the way of procuring the manufacture of the new band to order.

His sole excuse, then, is found in his own sworn statement as a witness as follows:

" I do not mean to be understood that any fairly skilful mechanic familiar with rubber tires could not, if given time and opportunity, have devised a machine for making the joint in the channel and drawing up this rubber; in fact I could have done so myself, I believe, at almost any stage of the proceeding, but the problem was to get some machine or system of doing this economically, so that the general public, or the small dealers could afford the appliances for doing the work themselves. As the system has been conducted the application has been confined to a few large places, and wheels and tires had to be transported long distances, while there was a constantly-increasing demand, not only by the small dealers but their patrons for the application of these tires at their own homes or places of business, and the great expense of the Grant and Goodyear system was a great drawback. I was trying to overcome this by devising tools so inexpensive and a system so simple that it did not require an expert to use them, and that the ordinary and small carriage-dealers could afford to have them."

This was followed by the admission that he had heard of the Morgan and Wright method of joining the tires in the channels, in the fall of 1897, but had not seen one of their devices before the fall of 1898. The contention of Stapleton, upon the foregoing and other explanatory evidence, is fairly presented in the following proposition on his brief:

" It is not claimed that Stapleton during the two years was constantly experimenting with this ' wire band.' On the contrary, it is frankly admitted that the invention itself — that is, the ' wire band ' — was completely invented when first thought of, but it is insisted that during this time Stapleton was, as diligently as the law requires, engaged in perfecting practical devices which were accessory and absolutely essential to the usefulness of the principal device, which, without some such accessory device, was of no commercial value whatever — was as steam without an engine, the sewing-machine needle without the mechanism to run it, a telegraph-line without recording devices."

We are unable to concur in this proposition. It is hardly necessary to say that the invention was not complete with even the clearest conception of the practical advantages and usefulness of the new form of retaining band, without the construction of at least one complete tire capable of test by use. Whether, considering the state of the art, that would be sufficient without the actual test need not be considered. The improved tire was an invention separate and distinct from the means sought for its simple and ready application to the wheel and, in that sense, was complete without the successful attainment of the latter end. It is no doubt true, and may be conceded, that Stapleton worked with reasonable diligence to obtain a simple and economical device for applying the new tire, and that he has succeeded in producing one of great utility as well as of patentable novelty. But the utility and commercial value of the improved tire did not necessarily depend upon that attainment. In that respect there was no practical difference between it and the earlier tires for the displacement of which it had been devised. There were other methods and devices in operation,

as we have seen, which, though crude and cumbersome, had nevertheless proved sufficient to extend the use of, and give commercial value to the former tires; and these had been successfully used by Kinney with the improved tire. Now it is true that one may make an original discovery, or conceive a distinct and valuable improvement in an art, dependent for its practical demonstration or operative use upon the invention of further or additional mechanical appliances. Notwithstanding the two devices, in such case, could be regarded as patentably distinct and separate in the Patent Office, it might well be that pause in the perfection of the one would be excused by due diligence in the completion of the other as its accessory. *Chapman* v. *Candee & Taylor,* S. C.; C. D., 1872, 190; 2 O. G. 245. That was an interference proceeding involving the invention of a device for forging wrench-heads that had formerly been forged by hand. It comprised certain dies and auxiliary machinery. Chapman was the first to conceive. His rival made the first application and received a patent, but never made or operated the invention. Chapman's first results were unsatisfactory and he pursued the discovery of operative means with diligence. Finally, by continuous labor and experiment and the expenditure of more than $5,000, he completed a machine that operated with complete success. In holding Chapman entitled to the benefit of his prior conception, Mr. Commissioner Leggett said:

" Though the invention, in a narrow sense, was complete upon the completion of the dies, yet the dies were totally valueless until machinery could be constructed of the proper strength and form to use them. Whether such machinery to work dies of large size was practicable was uncertain. Upon the determination of this point depended the question as to whether the dies were worth patenting; hence the time spent in constructing the machinery was used in such experimental tests as were wise and proper before applying for a patent."

It has also been held that under certain conditions some indulgence might be extended to an inventor who delayed a particular feature of a complicated machine whilst diligently

engaged in developing another part of the same machine calculated to materially increase its usefulness and value. *McCormick* v. *Cleal,* 12 App. D. C. 335, 341; *Christensen* v. *Ellis,* 17 App. D. C. 498; 94 O. G. 2561.

We think it sufficiently clear, without further discussion, from the history of the art and the facts of the case at bar, as heretofore stated, that the conditions of diligence upon which it turns are essentially different from those upon which the foregoing decisions were expressly rested.

Moreover, as has been repeatedly stated, it is impossible to measure diligence by any fixed standard. Each case must be determined by its own particular circumstances.

Considering the special circumstances of the case at bar, we are of the opinion that Stapleton's efforts to invent machinery for the simpler, cheaper and more effective application of the improved tire, cannot be accepted as due diligence in completing its invention. Grant that some measure of indulgence might justly be extended him, under ordinary circumstances, in respect of the matter of actual construction and test of commercial value, yet, the well-known conditions of the art and the wide-extended trade in rubber tires, subject to similar difficulty and expense in application, made it incumbent upon him to, at least, seek constructive reduction by filing an application for a patent. Why he did not do this much remains unexplained. His conduct in both respects is in marked contrast with that of Kinney who conceived the invention in October, 1898, filed his application for patent in January, 1899, and commenced manufacture for the trade in the following April.

For the reasons given, the decision of the Commissioner of Patents will be *affirmed, and the proceedings in this court will be certified to him as required by law. It is so ordered.*